**GREGG et al. v. HARPER–TURNER OIL CO. et al.**

No. 4481.

United States Court of Appeals
Tenth Circuit.

Oct. 1, 1952.

Houston "Bus" Hill and Wayne W. Bayless, Oklahoma City, Okl. (Richard H. Godfrey, Oklahoma City, Okl., on the brief), for appellants.

T. Murray Robinson, Oklahoma City, Okl. (C. E. Barnes, Oklahoma City, Okl., on the brief), for appellees.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action for the partial cancellation of an oil and gas lease given by appellants to one R. T. Harber and by him assigned to appellees, F. E. Harper and Roy J. Turner, on the ground of failing to diligently develop and operate the leased premises. The lease was dated July 27, 1947, and covered the Northwest Quarter (NW¼) of Section Eight (8), Township Fourteen (14), North Range Two (2), West I.M., located in Oklahoma County, Oklahoma. On October 31, 1943, appellees, other than the Liberty National Bank and Trust Company of Oklahoma,[1] completed Gregg No. 1 oil well in the center of the Southeast 40 acres of the tract. On August 29, 1947, after repeated demands, the same appellees completed the drilling of Gregg No. 2 on the Southwest Quarter of the tract in question. This well, while making some oil, was abandoned as a dry hole on September 26, 1947. No further drilling operations have been undertaken on the leased premises. Upon proceedings instituted by appellees, the Corporation Commission of Oklahoma unitized what is known as the East Edmond Bartlesville Unit November 15, 1948. The Southeast Quarter of the leased premises, on which Gregg No. 1 was located, was taken into the unit but the remaining 120 acres were excluded therefrom. The primary term of the lease expired July 27, 1949. Re-

peated demands, both oral and written, were made upon appellees thereafter for development on the undeveloped portion of the tract, all of which were refused on the ground that in view of the dry hole on the Southwest Quarter of the tract and in view of the thickness of the sand under the Gregg No. 1, they did not believe that they were justified in risking the cost of drilling a well on either of the North 40 acres of the North half of the tract.

The case was tried to the court and it made findings of fact and conclusions of law and based thereupon entered judgment, dismissing plaintiff's cause of action. The trial court found that the repeated demands for the drilling of additional wells were not complied with; that no evidence of present or prior drainage of sufficient consequence to offset tracts had been presented to require the court to consider that feature of the case; that the plaintiffs had failed to discharge the burden resting upon them to prove by a preponderance of evidence the lack of diligence on the part of defendants in the operation and development of the oil and gas leases; that defendants had not abandoned the possibility of drilling additional wells on the leased premises in question if future developments made it appear reasonably probable that a well drilled there would produce oil and gas in sufficient quantities to justify the drilling, completing and the producing thereof. The court concluded as a matter of law that in view of defendant's continuous endeavor to procure additional geological data since the completion of Gregg No. 2 and their willingness to drill an additional well or wells in the event future developments should justify such action, it could not be said as a matter of law that they had failed to diligently develop and operate the leased premises. Based upon these findings and conclusions of law, judgment was entered, dismissing plaintiff's complaint and cause of action, and this appeal followed.

---

1. For the purpose of this litigation reference need be made only to Harper and Turner and the Harper-Turner Oil Com-

pany and reference as to them will be made as Harper and Turner.

The rights, duties and obligations of a lessee under the implied covenant to diligently explore, develop, and produce oil and gas from leased premises has been the subject of numerous decisions in which, as in many instances, courts have not been harmonious in their conclusions or the reasons assigned therefor. It is quite generally agreed in all cases that the implied covenant requires a consideration of the rights of both the lessor and the lessee and that in the end the final determination and protection of those rights resides with a court of equity and not alone with either the lessor or the lessee.[2] So also the great weight of authority is that it is inequitable to permit a lessee to refuse to undertake full development of the premises and merely hold the undeveloped portion thereof for an unreasonable length of time for merely speculative purposes.[3]

There has been developed what is known as the prudent operator theory in determining the liability of a lessee for additional development after the initial well. Simply stated, the rule is that a lessee is not required to undertake additional development unless a prudent operator would do so and whether a prudent operator would undertake such additional development is determined by whether there is reasonable expectation that the cost thereof as well as a profit on the investment might be returned.[4]

Since this is an Oklahoma case, we are bound by the rule prevailing in that state. The later cases in Oklahoma leave no doubt that the prudent operator rule, as outlined above, is no longer the true test to determine the liability of a lessee for full development of leased premises. Under the rule laid down in Doss Oil Royalty Co. v. Texas Co., 192 Okl. 359, 137 P.2d 934, and reaffirmed in Colpitt v. Tull, 204 Okl. 289, 228 P.2d 1000, whether there is likelihood of profit to the lessee from further drilling operations "must be taken in a restricted sense and is not of universal application" [192 Okl. 359, 137 P.2d 938] and is but one factor to consider together with all other relevant facts and circumstances.

In the Doss case the Oklahoma Supreme Court treated extensively the subject of the right of cancellation of oil and gas leases for failure to fully develop. It reviewed not only many cases from other states but also many of its own decisions dealing with the subject. It called attention to the inconsistencies in the decisions, including its own, as to the reason assigned for the cancellation of leases under particular circumstances. It pointed out that some courts, including its own, had placed their decision on the ground of abandonment, when in fact there was no abandonment; others on the ground of implied covenant to develop without requiring proof that additional wells might be drilled with reasonable expectation of profit to the lessee; while still others placed their decisions on broad equitable ground without assignment of any theory. It is pointed out that there can be no abandonment in the absence of a provision in the lease, without intent to relinquish. The court pointed out that in the absence of any provision in the lease where initial development had occurred, and thereafter a substantial part of the premises remained undeveloped for an unreasonable length of time, the true basis for the forfeiture of the lease was a breach of the implied covenant to develop and operate the lease with due regard for the rights of the lessor as

---

2. Doss Oil Royalty Co. v. Texas Co., 192 Okl. 359, 137 P.2d 934; McKenna v. Nichlós, 193 Okl. 526, 145 P.2d 957; Ferguson v. Gulf Oil Corp., 192 Okl. 355, 137 P.2d 940; Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801.

3. Ramsey Petroleum Corp. v. Davis, 184 Okl. 155, 85 P.2d 427; Sauder v. Mid-Continent Petroleum Corp., 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255; Trust Company of Chicago v. Samedan Oil Corp., 10 Cir., 192 F.2d 282.

4. Trust Company of Chicago v. Samedan Oil Corporation, 10 Cir., 192 F.2d 282; Pelham Petroleum Co. v. North, 78 Okl. 39, 188 P. 1069; Mercer v. American Oil & Refining Co., 173 Okl. 515, 49 P.2d 101; Indiana Oil, Gas, & Development Co. v. McCrory, 42 Okl. 136, 140 P. 610; Eastern Oil Co. v. Beatty, 71 Okl. 275, 177 P. 104; Ramsey Petroleum Corporation v. Davis, 184 Okl. 155, 85 P.2d 427; Summers Oil and Gas, Section 414, Page 370.

well as those of the lessee. It is stated in the opinion, "Neither the lessor nor the lessee is the arbiter of the extent to which, or the diligence with which, the lessee shall proceed, but such question is committed to the sound discretion of the courts to be determined from the facts and circumstances of each case." The court states that "To permit the lessee to hold the lease for an unreasonable length of time for merely speculative purposes, is to allow him to protect his own interest and to disregard the interest of the lessor. If conditions do not indicate to him that further development will be profitable, it is but fair that, after a reasonable time has expired, he surrender the undeveloped portions of the lease and allow the lessor to procure development by others or assume the burden of showing why in equity and good conscience the undeveloped portion should not be cancelled * * *."

■ Colpitt v. Tull, supra [204 Okl. 289, 228 P.2d 1003], reaffirmed the doctrine of the Doss case. In it the court quoted extensively from the Doss case and concluded that "When there is an unreasonable delay in drilling additional wells plaintiff is not required to prove that additional wells would have been profitable."

■ No hard or fast rule can be laid down as to what constitutes an unreasonable delay. Ten years may not be unreasonable in one case, while five years may be unreasonable in another. Each case depends upon its own peculiar facts and circumstances. The elapsed time here since the drilling of the last well is not as great as in either the Doss or Colpitt cases. But there are present factors that were absent in both of those cases. Here we have a tract of 160 acres covered by a single lease. As stated, the original well was drilled October 31, 1943. After insistent, repeated demands, the second well was completed on the Southwest forty acres of the tract September 26, 1947. While this well produced some oil, it was abandoned as a non-commercial well. The hydrofracing method of completing wells was not known when Gregg No. 2 was brought in. It came into use in the early part of 1949. There is testimony that if this well had been treated

with hydrofrac in 1949, after its effects had become known, it would have made a commercial well. Immediately South and adjacent to the Gregg tract lies an oil producing area of 1,040 acres, having a producing well on each 40 acre tract. All of this acreage is owned by Harper and Turner. A considerable portion of the royalty under twelve of these wells is also owned by the Harper children. Oklahoma has a compulsory unitization law. On November 15, 1948, upon proceedings instituted by Harper and Turner, the Oklahoma Corporation Commission unitized the 1,040 acres and the Southeast 40 acres of the Gregg tract, but excluded the remaining 120 acres of the Gregg tract therefrom. The Gregg Southeast 40 acre tract was assigned a 1.44% participating factor, the 40 acre tract immediately to the South thereof was given a 1.80% participating factor, and the 40 acre tract immediately offsetting the Southwest 40 acre Gregg tract was given a 2.50% participating factor. While the trial court found that drainage from offsetting wells was not a factor, we think it is clear that some drainage must be taking place from the Gregg Southwest 40 acre tract through the offset well immediately to the South thereof. While it is in dispute whether oil in commercial quantities underlies the Gregg Southwest 40 acre tract, it is without dispute that considerable oil underlies it. We may take judicial knowledge that some of this oil is being drained off through the producing well immediately to the South.

In July, 1950, Ashland Oil and Refining Company drilled a commercial well, Shannon No. 1, approximately three-fourths of a mile Northwest of the Gregg tract. In October of 1950, Harper and Turner drilled a commercial offset to this well to the West. Schardt No. 1, a commercial well, was drilled on the 40 acres immediately offsetting the Northwest corner of the Gregg tract in July, 1951. It thus appears that the Northwest 40 acres of the Gregg tract lies in a line between two producing wells to the Northwest and the Gregg No. 1 to the Southeast.

Harper and Turner are not now and have not been for some time engaged in

activities looking to the accumulation of geological data bearing further upon the oil producing potentialities of the 120 acre tract excluded from the production unit, nor are they engaged in any activities with relation to that tract. Notwithstanding the producing well immediately offsetting the Northwest 40 acres of the Gregg tract, they are merely standing by awaiting further drilling developments by others before they determine their future course with respect to the 120 acre tract. Mr. Ware, the geologist and manager for exploration for Harper and Turner, testified that he thought that "Harper-Turner Oil Company having drilled two wells on the lease, and there is no evidence whatever to indicate they are being drained or hurt by any outside drainage, they have every right in the world to wait until offset production actually comes to them to tell whether or not to drill." This clearly and fairly sums up their attitude toward the 120 acre tract. They do not intend to do anything until someone else proves or condemns this acreage. This they may not do under the Oklahoma rule as applied to the peculiar facts and circumstances of this case. Harper and Turner caused the unitization agreement excluding this 120 acre tract therefrom to be effected. This resulted in a division of the acreage of the Gregg tract, covered by the original lease. As the owner of the lease, they now stand in a different relationship to the excluded acreage than they do to the 40 acres included in the producing unit. Equity will consider the rights of both the lessor and the lessee under these circumstances. Their responsibilities as lessees become correspondingly greater toward the excluded acreage than it was before severing by unitization. Sans the question of drainage, they have no particular interest in further developing this 120 acre tract. They will ultimately recover all the oil thereunder through the well on the Southeast 40 acres. Neither are they too vitally concerned with the participation factor assigned to this well, because they own the entire acreage in the producing unit. But the lessor's interests are entirely different. If there is possible commercial production under all or any part of the 120 acre tract—and there is conflicting evidence on that question— they are obviously being hurt. Under these facts and under the dual relationship in which the lessees stand with respect to the 120 acre tract and the 40 acre tract, a part of the producing unit owned entirely by them, we think equity requires more than that they sit by until such time as someone else may decide to drill a well on the offsetting acreage and in the meantime pump the oil from under this tract through their well on the Southeast 40 acres.

While not controlling, it is of some significance that prior to unitization the Greggs were each receiving $35 to $50 per month from the one well and, since unitization, they are receiving but $6 to $7 per month. They obviously have a greater interest in having full development of the lease than do the lessees. The implied covenants of a lease contemplate orderly, uninterrupted, full development of the lease for the benefit of both parties, and equity will compel it. There is enough in the record to sustain the contention that further development under present methods would result in commercial production and under the Oklahoma rule the lessors were not required to prove by a preponderance of the evidence that profit would result to the lessees.

Trust Co. of Chicago v. Samedan Oil Corp., 10 Cir., 192 F.2d 282, by this court, upon which reliance is placed to defeat cancellation, is not in point. There, as pointed out in the opinion, the lessee was actively engaged in activities from which to determine future operations. We think the trial court's findings and conclusions are at variance with the requirement of the Oklahoma rule and are, therefore, erroneous and must be set aside.

Under the facts as outlined herein and in view of the dispute as to the production possibilities of that tract under the hydrofracing method, we see no inequity in requiring Harper and Turner to complete the well now thereon or further test the 120 acre tract, since it was excluded from participating in the unit production instituted

**6**

by them. Or if they are firmly of the view that there is no production thereunder, they ought not under the circumstances in good conscience and equity be permitted to retain the tract and deny the Greggs the opportunity to have it explored and tested.

 Appellants seek judgment cancelling the lease, notwithstanding paragraph 10 of the contract, which provides that upon judicial determination that the lessee is obligated to drill a well or wells, that lessee shall have ninety days thereafter to commence the drilling thereof. The reasons assigned for this position need not be explored because in our view the result would be the same if this provision were not in the lease. The Oklahoma rule makes it clear that equity will not require forfeiture of a lease merely because there has been unreasonable delay in further development but, except in extraordinary cases, the lessee should nonetheless, be given a reasonable time to comply with the duty of further development. We think ninety days is a reasonable time after the mandate of this court comes down and that under all the facts and circumstances of this case appellee should be given that time within which to commence further developments.

The judgment of the trial court is, therefore, Reversed and the cause is Remanded, with directions to enter judgment cancelling the lease as to the 120 acres, unless appellee shall within that time commence, and diligently prosecute to completion further development of the undeveloped portions of the 120 acre tract.