Lee WEST and Seba West, Guardian of the
estate of Joe West, a Minor,
Plaintiffs In Error,

v.

SUN OIL COMPANY, a Corporation,
Defendant in Error.

No. 43311.

Supreme Court of Oklahoma.

Nov. 9, 1971.

Hieronymus & Hodgen, Woodward, for plaintiffs in error.

Royse Parr, Tulsa, and Royse & Meacham, by Donald Royse and Holland Meacham, Elk City, for defendant in error.

McINERNEY, Justice.

Lee West and Seba West, guardian of the estate of Joe West, a minor, plaintiffs, brought this suit to cancel a portion of an oil and gas lease. The lease covered the W/2 of Section 16, T 1 6 N, R 22 W, Roger Mills County, Oklahoma. Plaintiffs requested cancellation of the lease only as to the SW/4 of Section 16. After the trial court refused to decree cancellation, plaintiffs perfected this appeal.

The lease was executed in April, 1957, for a primary term of ten years and as long thereafter as oil or gas is produced. In May, 1966, Sun Oil Company, defendant, was assigned the portion of the lease which covered the SW/4 of Section 16. Under an operating agreement with the assignee of the portion of the lease covering the NW/4 of Section 16, in September, 1966, defendant completed a producing oil well

in the SE/4 of the NW/4 of Section 16 to the Tonkawa Sand. Defendant drilled two other wells in Section 16 to the Tonkawa Sand under the same operating agreement. One was a producing oil well in the NW/4 of the NE/4 of Section 16; the other was a dry hole in the NW/4 of the SE/4 of Section 16.

The leased property is located in an area known as the South Peek Field which has both oil and gas wells producing from the Tonkawa Sand. The Corporation Commission has established 80 acre drilling and spacing units for oil production from the Tonkawa Sand under the leased premises and all other properties located in the South Peek Field. However, defendant introduced evidence that, although there are many oil producing sections in the South Peek Field, Section 16 and Section 9 immediately north are the only sections with more than one oil well.

In April, 1967, less than one year after completion of the well on the NW/4 of Section 16, plaintiffs demanded in writing that defendant drill on the SW/4 of Section 16 or release the lease on that quarter. Defendant replied that it was evaluating production from the two wells in Section 16 and other wells in Sections 9 and 4, that these wells seem to be uneconomical, that production for four or five more months would be necessary for a final determination, and that it would not at that time risk additional expense on a venture which would probably operate at a loss. Plaintiffs made a second written demand in August, 1967, for development of the SW/4 of Section 16 within ninety days and stated that suit would be commenced after expiration of the ninety day period. The reply noted defendant's exploratory activities in the area and stated that defendant was not required to further develop the SW/4 of Section 16 at that time. This suit was commenced in January of 1968.

Plaintiffs base their right to cancellation on breach of the implied covenant to further develop the leased premises. To prove this breach, plaintiffs introduced the testimony of a consulting petroleum engineer who had been involved in oil and gas drilling and production since 1939 and had been a consulting supervisor of oil and gas drilling and producing operations for nineteen years. Based on a study of logs, engineering information, geological information and other available information on the SW/4 of Section 16 and surrounding area, he testified that in his opinion, a well on the SW/4 of Section 16 would produce between 75,000 and 100,000 barrels of oil which would have a value in excess of $200,000.00, that the cost of drilling this well to the Tonkawa Sand would be $100,000.00, and that the total operating cost would be between $35,000.00 and $40,000.00. Relying on these estimates, he testified that he would recommend drilling a well on this quarter section, and that a prudent operator would drill at least one well, possibly two wells.

Defendant contradicted plaintiffs' evidence with testimony from its district geologist and a consulting geologist. The district geologist testified that he estimated a loss of $70,000.00 on the well in the NW/4 of Section 16, that the dry hole in the SE/4 of Section 16 reduced the possibility of a paying well on the SW/4 of Section 16, and that he would not recommend drilling a well on the SW/4 of Section 16. The consulting geologist testified that the 50% decline in production during the past year from the well on the NW/4 of Section 16 "indicates that the commercial worth of the well is becoming established and it is becoming established that it is more worthless every day." He also testified that he would not recommend drilling a well on the SW/4 of Section 16. In addition to this evidence, one of defendant's employees testified to an unsuccessful attempt to farm out the lease on the SW/4 of Section 16. Also, defendant's offer to release the lease on this quarter to the base of the Tonkawa Sand remained open at the time of trial. Plaintiffs refused to accept this offer and proceeded with this suit for cancellation of the lease as to all formations.

Defendant's evidence established its lack of interest in further production from the Tonkawa Sand under Section 16. However, defendant introduced evidence of extensive exploration activities in the vicinity of the leased premises. The primary purpose of these activities was to determine if the Hunton formation existed in the area. Discovery of gas in the Hunton formation near the end of 1966 approximately 22 miles east of the South Peek Field in an area known as the Aledo Field contributed to increased emphasis on these exploration activities. Production of gas in the Aledo Field was described as "prolific."

Defendant began its seismic activities in September, 1967, with a large crew of 18 employees. This crew was costing defendant around $40,000.00 per month; approximately $350,000.00 had been expended at the time of trial. Defendant estimated it would require at least one year, possibly 18 months, to complete the seismic survey at a total cost of $800,000.00 to $1,000,000.00. One of the seismic shot lines was adjacent to the leased premises and indicated a potential structure trap at the Hunton depth.

Defendant also introduced evidence of its extensive drilling activities to the Tonkawa Sand, the only known producing formation in the South Peek Field. Prior to April, 1968, defendant participated in and had a working interest in 33 of the 53 wells which had been drilled in this field.

■ To establish a breach of the implied covenant of further development, plaintiffs do not rely on defendant's failure to drill a well which would have produced a reasonable profit on the total cost of drilling, equipping and operating it. Instead, plaintiffs argue that defendant's expressed intention not to further develop the Tonkawa Sand under the SW/4 of Section 16 constitutes sufficient ground to decree a cancellation of that portion of the lease.

In Wolfson Oil Co. v. Gill, Okl., 309 P.2d 282 (1957), this Court indicated cancellation was justified although the lessee proved that a prudent operator would not drill additional wells and such evidence demonstrated, under the circumstances of that case, that the purpose of the lease (reasonable development) had ceased to exist. 309 P.2d at 284. However, the lessee in *Gill* had not conducted expensive exploration activities with additional extensive activity projected. In fact, after a secondary water flood program had been unsuccessful, the *Gill* lessee still desired to hold the lease because further exploratory methods and geological data might make secondary recovery feasible. Furthermore, in *Gill*, the last wells had been drilled on the leased premises about 35 years before the suit was commenced. Here, slightly more than a year had elapsed between the last well and commencement of the suit.

This Court affirmed the cancellation of a portion of the lease in Coal, Oil & Gas Co. v. Styron, Okl., 303 P.2d 965 (1956), without proof that a prudent operator would drill additional wells when only three years had elapsed between the drilling of a well on the leased premises and the commencement of the suit. In *Styron*, the lessee introduced evidence that the one well on the leased premises was an edge well, and that a prudent operator would not drill additional wells. Notwithstanding this proof, the *Styron* lessee wanted to retain the lease because of the possibility of another reservoir under the leased premises. However, the *Styron* lessee had not expended substantial funds on exploratory activities to investigate this possibility.

In several cases, this Court has disapproved cancellation when the lessee demonstrated a willingness to investigate or test for other producing formations. Shell Oil Co. v. Howell, 208 Okl. 598, 258 P.2d 661 (1953); Skelly Oil Co. v. Boles, 193 Okl. 308, 142 P.2d 969 (1943); Ferguson v. Gulf Oil Corp., 192 Okl. 355, 137 P.2d 940 (1943); Union Oil Co. v. Jackson, Okl., 489 P.2d 1073, decided October 19, 1971. In both *Howell* and *Boles,* the lessees had expended money on preliminary

investigation of deeper horizons and had conducted negotiations for sharing the cost of deep test wells with other lessees in the area. The lessee in *Ferguson* had drilled several deep test wells to determine production possibilities from lower formations in the vicinity of lessor's property. In *Jackson*, the lessee had completed numerous oil and gas wells to the known producing formation in the area, had conducted extensive geological and geophysical surveys, had participated in studies to enhance production and was awaiting results of a test well on a nearby tract.

 Defendant has participated in extensive development of the area in the vicinity of the leased premises including the producing oil well located on the north half of the leased premises from which plaintiffs have been receiving regular royalty checks. Moreover, defendant has incurred substantial expense for a seismic survey of the area near the leased premises for the purpose of determining the advisability of drilling test wells to other possible producing formations. And a considerable amount of additional expenditures for these investigative activities were projected at the time of trial. Under these circumstances, it would be inequitable to cancel defendant's lease on the SW/4 of Section 16. Ferguson v. Gulf Oil Corp., supra, 192 Okl. at 357–358, 137 P.2d at 942–943; Union Oil Co. v. Jackson, supra. However, defendant must proceed in a reasonable and prudent manner with activities calculated to ultimately conclude with production from plaintiffs' property; it cannot retain the lease indefinitely without further development of the leased premises. Shell Oil Co. v. Howell, supra, 208 Okl. at 602, 258 P.2d at 665; Skelly Oil Co. v. Boles, supra, 193 Okl. at 311, 142 P.2d at 971.

Affirmed.

BERRY, C. J., DAVISON, V. C. J., and WILLIAMS, JACKSON, HODGES and LAVENDER, JJ., concur.